**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNIVERSAL COMPUTER** | : | |
| **CONSULTING, INC., et al.,** | : | |
|      **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
|   **v.** | : | |
| | : | |
| **PITCAIRN ENTERPRISES, INC.,** | : | **No. 03-2398** |
| **et al.,** | : | |
|      **Defendants.** | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Schiller, J.**                                                                            **August 26, 2005**

On April 21, 2003, Plaintiffs Universal Computer Consulting, Inc. and Universal Computer Maintenance, Inc. commenced this action against Defendants Pitcairn Enterprises, Inc. ("PE"), Kean Pitcairn, Kris Pitcairn, 1862 Lincoln Highway Associates, L.P. ("1862 Associates"), and Kean Company. Plaintiffs allege wrongful conduct in connection with the sale of PE's assets, specifically: (1) statutory fraud, in violation of the Pennsylvania Uniform Fraudulent Transfer Act; and (2) equitable fraud, in violation of Pennsylvania common law. After a bench trial on July 13 and 14, 2005, the Court now enters the following Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a).

## I.      FINDINGS OF FACT

### A.      The Parties

Plaintiffs manufacture and install inventory software for car dealerships. *Universal Computer Consulting, Inc. v. Pitcairn Enters., Inc.*, Civ. A. No. 03-2398, 2004 WL 345415, at *1, 2004 U.S. Dist. LEXIS 2719, at *3 (E.D. Pa. Feb. 23, 2004). In 1989, Plaintiffs entered into a series

of maintenance and support contracts with Defendant PE, which owned and operated Volvo and Volkswagen franchises. *Id.* Plaintiffs obtained an arbitration award against PE, arising from PE's breach of those maintenance and support contracts, which subsequently became a judgment. *Id.* at *1-2. Plaintiffs contend that on August 5, 2002, PE structured a sale of substantially all its assets in a manner that would evade Plaintiffs' judgment. *Id.* at *2-3.

Plaintiffs have named four additional defendants, each having a connection to PE and to the asset sale. In 1996, Defendant Kean Pitcairn and his wife, Defendant Kris Pitcairn, collectively acquired 100% of PE's stock. (R. at 41 (July 13, 2005).) Since 2000, Defendant Kean Pitcairn has been PE's sole stockholder and, at all relevant times, has functioned as PE's president. (*See id.* at 48, 228-29.) Defendant Kean Company, a company formed in 2002, currently has an assignment from PE, which allows it to collect rent payments and retain a management fee. (*Id.* at 193-94, 229.) Finally, at all relevant times, Defendant 1862 Associates owned the land and premises where PE conducted its business. (*Id.* at 97-98.)

**B.    The Arbitration Award and Judgment**

On June 7, 2000, Plaintiffs filed a demand for arbitration against PE, pursuant to a mandatory arbitration clause in the parties' maintenance and support contracts. *Universal Computer*, 2004 WL 345415, at *1-2; (Pls.' Trial Ex. 1 (Docket Entries: Arbitration).) On August 29, 2001, an American Arbitration Association arbitration panel held that PE had breached those contracts by failing to pay Plaintiffs' invoices. (Pls.' Trial Ex. 2 (Arbitration Award).) The arbitration panel awarded Plaintiffs $412,112.53 in damages and attorneys' fees, a sum which was to accrue 10% interest per annum until paid in full. (*Id.* at 14-15.) On December 10, 2001, Plaintiffs petitioned to confirm the

arbitration award in the United States District Court for the Southern District of Texas.[1] (Pls.' Trial Ex. 7 (Docket Entries: Texas Litig.).) On April 16, 2002, that court confirmed the award and entered a judgment in favor of Plaintiffs and against PE. (Pls.' Trial Ex. 8 (Order of Apr. 16, 2002).) The court also stated that Plaintiffs were "entitled to fees and expenses incurred in connection with the collection of the final judgment and Order Confirming Award." (*Id.*)

PE, meanwhile, pursued parallel litigation in Pennsylvania to enjoin the arbitration proceedings. On November 1, 2000, PE filed a complaint in this Court, claiming that Plaintiffs had waived their right to arbitration by failing to timely name an arbitrator. (Pls.' Trial Ex. 4 (Mem. & Order of June 19, 2001); *see also* Pls.' Trial Ex. 6 (Third Circuit Op. of June 14, 2002).) On June 20, 2001, however, the late Honorable James McGirr Kelly granted summary judgment in favor of Plaintiffs, holding that it was for the arbitration panel to decide whether Plaintiffs had waived their right to arbitrate. (Pls.' Trial Ex. 4.) On June 14, 2002, following oral argument on April 11, 2002, the Third Circuit affirmed Judge Kelly's decision in its entirety. (Pls.' Trial Ex. 6.)

### C.    The August 5, 2002 Asset Sale

In the months immediately preceding the asset sale, PE was in "financial distress" and was "hemorrhaging." (*See* R. at 329 (July 13, 2005); R. at 118 (July 14, 2005).) PE's financial statements indicate that, for the past few years, PE's debts had been exceeding its assets. (*See* Pls.' Trial Ex. 21 (PE Fin. Statement of Dec. 31, 2000), Ex. 24 (PE Fin. Statement of Dec. 31, 2001).) By the middle of 2002, PE was generally not paying its debts as they became due. (*See, e.g.*, Defs.'

---

[1] Under § 9 of the Federal Arbitration Act, if the parties to an arbitration agree that a court judgment shall be entered upon an arbitration award, "then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court *must* grant such an order unless the award is vacated, modified, or corrected . . . ." 9 U.S.C. § 9 (2005) (emphasis added).

Trial Ex. 119 (Letter from Bradley Gunnison to Kean Pitcairn of May 28, 2002) (stating that PE had

failed to pay rent to 1862 Associates); Pls.' Trial Ex. 75 (Handwritten Notes of Kean Pitcairn of Apr.

30, 2002) ("Pay only the bill[s] that we have to to keep the dealership going, work with others to let

them know we are working on a plan to get them paid.").)

Accordingly, on May 28, 2002, PE entered into an Asset Purchase Agreement with R&S

Imports, Ltd. ("the Buyer") for the sale of PE's car dealerships.  (Pls.' Trial Ex. 58 (Mem. of

Closing).)  On August 5, 2002, the Asset Purchase Agreement closed and the car dealerships were

sold for $8,322,579.35.  (Defs.' Trial Ex. 9 (Bill of Sale).)  With the money that PE received from

this sale, Kean Pitcairn was able to pay many of PE's outstanding debts.  (*See id.*)

Plaintiffs, despite the April 16, 2002 judgment in their favor, did not receive any of that

money.  Kean Pitcairn concealed the asset sale from the public and did not inform Plaintiffs that a

sale was taking place.  (*See* R. at 330-31 (July 13, 2005).)  Furthermore, Kean Pitcairn never

informed the Buyer that Plaintiffs held a final judgment against PE.  (*See* R. at 334-39 (July 13,

2005); *see also* Pls.' Trial Ex. 59 (Original Sched. 4.6), Ex. 60 (Final Sched. 4.6), Ex. 61 (Seller's

Certificate).)  Instead, Kean Pitcairn misrepresented to the Buyer that an appeal on "certain aspects

of the arbitration" was still pending in the Third Circuit, despite the fact that, on June 14, 2002, the

Third Circuit had "affirm[ed] the District Court's Order in its entirety."  (*See* Pls.' Trial Exs. 6, 59-

61.)  Kean Pitcairn concedes that, had he disclosed Plaintiffs' judgment to the Buyer, the Buyer

would have required that funds be placed in escrow to satisfy this judgment.  (R. at 336-37 (July 13,

2005).)

Kean Pitcairn insists that there would have been "sufficient funds" to pay Plaintiffs at the

closing had they registered their judgment in Pennsylvania.  (*Id.* at 332-33.)  Indeed, it is undisputed

that Plaintiffs were unsecured creditors at that time, because they did not register their judgment in the Bucks County Court of Common Pleas until August 30, 2002. (Pls.' Trial Ex. 9 (Registration of Foreign J.).) This argument, however, is undercut by the fact that some of the proceeds of the asset sale went to unsecured creditors, such as Kean Pitcairn's wife and his personal trust. (R. at 220, 324 (July 13, 2005).) Kean Pitcairn testified that these unsecured creditors were paid simply because they, unlike Plaintiffs, had "asked me for the money back." (*Id.* at 324 ("He asked me for the money back, you didn't at that point.").)

Plaintiffs argue that, following the asset sale, Kean Pitcairn improperly distributed PE's assets to the following individuals and entities: (1) Kris Pitcairn; (2) Kean Company; (3) 1862 Associates; and (4) non-parties Torrence Pitcairn and the Pitcairn Trust Company. The Court will examine the circumstances behind each of these distributions in turn.

1. *Kris Pitcairn*

With the asset sale proceeds, Kean Pitcairn distributed $600,000.00 to his wife, Kris Pitcairn. This payment was in return for an unsecured loan she made to PE on January 26, 2000, through a stock buyback transaction. (Defs.' Trial Ex. 8 (Kris Pitcairn Stock Redemption Agreement).) In 1996, Kris and Kean Pitcairn became PE's only stockholders as part of an estate planning mechanism. (R. at 41 (July 13, 2005).) Kris Pitcairn, using a loan from her husband worth approximately $500,000.00, acquired 80% of PE's stock. (*Id.*) Kean Pitcairn retained the remaining 20% as a gift from his father. (*Id.* at 47.) In October of 1999, Kris Pitcairn's 80% share was appraised at $745,300.00. (Defs.' Trial Ex. 10 (Appraisal by Jerome, Shinfeld & Assocs., P.C.) at 27.)

On January 26, 2000, Kris Pitcairn sold back her 80% share in PE, leaving 100% of the

5

company's stock with Kean Pitcairn.  (R. at 48 (July 13, 2005).)  She gave up her interest in PE for

tax purposes, and because she simply "didn't want to be the majority stockholder anymore." (*Id.* at

51-52.)  In consideration for her tendering her stock, PE paid Kris Pitcairn $156,000.00 in cash and

executed a promissory note for $615,400.00.  (*Id.* at 54; *see also* Defs.' Trial Ex. 8.)  The promissory

note, which carried an annual interest rate of 6.5%, represented a loan from Kris Pitcairn to the

company.  (Defs.' Trial Ex. 8.)  Kris Pitcairn, however, never collected any interest on this note.  (R.

at 58 (July 13, 2005).)  Moreover, she did not receive a security agreement or perfect a security

interest by filing a UCC-1.  (*Id.* at 58-59.)

Following the August 5, 2002 asset sale, Kris Pitcairn accepted a $600,000.00 check from

PE as repayment for her unsecured loan.  (*Id.* at 80-81.)  The check was not specifically identified

on the dealerships' bill of sale, for it came out of a $711,531.52 sum which was wire transferred to

PE.  (R. at 323 (July 13, 2005); *see also* Defs.' Trial Ex. 9.)  The wire transfer went to a new bank

account, which Kean Pitcairn claims to have created "to [keep] track of the funds from the closing

of the dealership."  (R. at 217-18 (July 13, 2005).)  From this account, Kean Pitcairn wrote the

$600,000.00 check to his wife who, in turn, deposited it into her personal checking account, which

she alone controls.  (R. at 218-23 (July 13, 2005).)  She did not use this money to repay her husband

for his $500,000.00 loan, which had initially enabled her to acquire 80% of PE's stock.  (*Id.* at 81.)

Kris Pitcairn testified that she is "not concerned about legal and business details." (*Id.* at 43.)

She was, however, aware of the dispute between Plaintiffs and PE, and became so aware within

"weeks or months" of her stock buyback transaction.  (*Id.* at 62.)  By the time of the August 5, 2002

asset sale, she was also aware that Plaintiffs had a money judgment against PE for several hundred

thousand dollars.  (*Id.* at 59-60.)  Despite this knowledge, she took and kept the $600,000.00 check

because Plaintiffs "hadn't registered [their judgment] in Pennsylvania." (*Id.* at 84.)

       2.   *Kean Company*

At the asset sale, PE entered into a real estate sublease with the Buyer. (R. at 76 (July 14, 2005).) Under the terms of the sublease, the Buyer does not pay rent directly to the car dealerships' landlords. (*Id.* at 124.) Instead, the Buyer pays the monthly rent to a middleman, i.e., the sublessor, who distributes that money to the landlords after subtracting a management fee. (*Id.* at 125-28.) The management fee compensates the sublessor for "deal[ing] with the issues between the landlord and the tenant, such as [a] septic system collapsing . . . ." (*Id.* at 77.) Currently, the Buyer pays a total of $43,000.00 per month in rent, and the sublessor (which, originally, was PE) collects approximately $7,000.00 per month as a management fee. (R. at 198 (July 13, 2005); R. at 125-28 (July 14, 2005).)

On August 29, 2002, less than one month after the asset sale, Kean Pitcairn assigned PE's rights as sublessor over to Kean Company. (Pls.' Trial Ex. 79 (Assignment of Lease and Authorization to Receive Rental Payments); *see also* R. at 229 (July 13, 2005).) Kean and Kris Pitcairn founded Kean Company in June of 2002 and own 100% of its stock (R. at 229 (July 13, 2005).) Kean Pitcairn testified that he made this assignment to Kean Company because "I was getting into real estate investing as my new career," and the first step of that new career would be "managing the rental payments from [the Buyer] to the different landlords." (*Id.*) He also testified, however, that Kean Company did not pay PE for the assignment and, indeed, the record reflects that the assignment was made in exchange for only $1.00. (*Id.*; Pls.' Trial Ex. 79.)

Thereafter, Plaintiffs filed a petition for supplementary relief in aid of execution in the Bucks County Court of Common Pleas. (Pls.' Trial Ex. 11 (Order of Dec. 23, 2002).) On December 23,

2002, the Honorable Susan Devlin Scott ordered Kean Company to place its monthly management fee from the sublease "into an escrow account until either further written agreement of the parties or further Order of [the] Court." (*Id.*) On April 21, 2005, the Honorable Robert J. Mellon ordered that "[a]ll monies currently held in escrow relating to this matter shall be paid directly to Plaintiff[s']" in partial satisfaction of their judgment against PE.[2] (Pls.' Trial Ex. 14 (Order of Apr. 21, 2005).) PE did not appeal Judge Mellon's order. (*See* R. at 200 (July 13, 2005).)

> 3. *1862 Associates*

PE also used the proceeds of the asset sale to repay secured creditor 1862 Associates. On February 27, 2002, 1862 Associates loaned PE $1,284,000.00. (Defs.' Trial Ex. 113 (Promissory Note of Feb. 27, 2002).) Kean Pitcairn requested this loan in late 2001, by approaching his brother, Clark Pitcairn, who was also the president of 1862 Associates' managing general partner, GarthCo, Inc. ("GarthCo"). (R. at 99-101, 116, 131 (July 13, 2005).) Kean Pitcairn suggested that 1862 Associates borrow $2,000,000.00, some of which would go towards repaying previous debt, and some of which would be lent to PE. (*Id.* at 116.) Clark Pitcairn believes that, previously, Kean Pitcairn had approached First Union about a loan, but that First Union "didn't want to lend any more." (R. at 134 (July 14, 2005).)

Clark Pitcairn depended on the third party lender, StanCorp Mortgage Investors, LLC ("StanCorp"), to evaluate PE's financial condition. (R. at 123 (July 13, 2005).) He did this because

---

[2] This escrow account has been the repository not only for Kean Company's monthly management fee, but also for funds PE receives from Universal Underwriters, the insurance company that provided the dealerships' insurance. (R. at 194-95 (July 13, 2005).) The Universal Underwriters funds have been transmitted to escrow pursuant to a September 15, 2004 order from Judge Scott. (Pls.' Trial Ex. 13 (Order of Sept. 15, 2004).) However, as the transfers between Universal Underwriters and PE are not part of this case, this Court will not discuss them further.

Kean and Clark Pitcairn, as well as several of their siblings, own stock in GarthCo and sit on GarthCo's board of directors. (*See id.* at 99-101, 124-25.) Clark Pitcairn had to "maintain walls . . . particularly with a sibling," to ensure that this loan was "totally above board." (*Id.* at 124.) He thus "relied totally on StanCorp to be the independent. If they came in and had any concern, there was going to be no loan to [PE]." (*Id.* at 124-25.)

On December 27, 2001, GarthCo's board met and approved a loan from StanCorp in the amount of $2,000,000.00, with an interest rate of 6.875% per annum. (Defs.' Trial Ex. 101 (GarthCo Resolution of Dec. 27, 2001).) In accordance with Kean Pitcairn's proposal, the $2,000,000.00 would be used both to pay off a previous debt and to lend money to PE. (R. at 133 (July 14, 2005).) On January 30, 2002, GarthCo's board approved a loan to PE of approximately $1,300,000.00. (Defs.' Trial Ex. 105 (GarthCo Meeting Minutes of Jan. 30, 2002).) The meeting minutes state that "StanCorp has concluded that there is sufficient cash flow from [PE] to support its loan." (*Id.*) The minutes further state that "Kean Pitcairn and Torrence Pitcairn abstained from voting on the forgoing motions based upon their equity and other financial interests in [PE], the recipient of the 1862 Loan." (*Id.*)

Following the January 30th meeting, the terms and conditions of the StanCorp loan changed slightly, with the interest raised to 7.125% per annum. (*See* Defs.' Trial Ex. 108 (Letter from StanCorp to 1862 Assocs. of Feb. 8, 2002).) On February 22, 2002, the StanCorp loan closed, and 1862 Associates received $2,000,000.00. (Defs.' Trial Ex. 111 (Settlement Statement of Feb. 22, 2002); *see also* Defs.' Trial Ex. 109 (Promissory Note of Feb. 14, 2002).) On February 27, 2002, 1862 Associates transferred $1,284,000.00 of the StanCorp loan to PE. (R. at 147-48 (July 14, 2005).) This loan allowed PE to become current on its rent payments to 1862 Associates, as PE was

9

eleven months behind. (*Id.*; R. at 150 (July 13, 2005).) 1862 Associates "fully intend[ed]" to be

repaid for this loan. (R. at 157 (July 14, 2005).) In fact, as a condition of the loan, PE had to grant

1862 Associates a security interest in its assets. (*Id.* at 148; *see also* Defs.' Trial Ex. 113.)

On April 11, 2002, GarthCo's board met for a third time and ratified the loan to PE "based

on a new commitment from the lender," i.e., StanCorp's February 8, 2002 letter. (Defs.' Trial Ex.

116 (GarthCo Meeting Minutes of Apr. 11, 2002); R. at 151 (July 14, 2005).) Again, "Kean Pitcairn

and Torrence Pitcairn abstained from voting on the forgoing motions based upon their equity and

other financial interests in [PE], the recipient of the 1862 Loan." (Defs.' Trial Ex. 116.) On April

12, 2002, the very next day, 1862 Associates filed a UCC-1, thus perfecting its security interest in

PE's assets. (R. at 154 (July 14, 2005); Defs.' Trial Ex. 117 (UCC-1 Fin. Statement of Apr. 12,

2002).) As of this date, Plaintiffs had not yet obtained their money judgment against PE. Clark

Pitcairn, moreover, was unaware that such a judgment was pending. (*See* R. at 145 (July 13, 2005).)

Clark Pitcairn was also unaware that, on the day beforehand, the Third Circuit had heard oral

argument on PE's parallel lawsuit against Plaintiffs. (*Id.* at 178-80.) Thus, regardless of Kean

Pitcairn's motivations at this time, Plaintiffs were "not a factor" in 1862 Associates' decision-

making. (R. at 158 (July 14, 2005).)

Following receipt of the $1,284,000.00 loan, PE made full rent payments to 1862 Associates,

with interest, in February, March, and April of 2002. (R. at 150 (July 13, 2005).) In May of 2002,

however, Kean Pitcairn notified Clark Pitcairn that PE was not going to be able to make the next rent

payment. (*Id.* at 148.) A dumbfounded Clark Pitcairn "couldn't believe it" and didn't understand

where the proceeds from the loan had gone. (*Id.*) Kean Pitcairn told him that an insider had

absconded with the money, a statement which Clark Pitcairn believed to be true because "that had

10

happened twice to my father." (*Id.* at 149.)  On May 28, 2002, 1862 Associates notified Kean

Pitcairn that if PE did not make its May rent payment within thirty days, "such failure to pay will

constitute an event of default."  (Defs.' Trial Ex. 119.)

At the August 5, 2002 asset sale, 1862 Associates received $1,284,000.00 from PE.  (Defs.'

Trial Ex. 9.)  This sum wholly reimbursed 1862 Associates for its loan to PE, less approximately

$50,000.00 in rent payments and interest for May, June and July of 2002.  (*See* R. at 164-65 (July

13, 2005).)  Accordingly, 1862 Associates agreed to release its UCC-1.  (*See* Pls.' Trial Ex. 53

(Letter from Clark Pitcairn to Kean Pitcairn of Aug. 5, 2002).).  Clark Pitcairn believes that, even

by August of 2002, he was still unaware of Plaintiffs' money judgment against PE.  (R. at 167 (July

13, 2005).)  In fact, Clark Pitcairn testified that he "didn't really know about the Plaintiffs" and, at

the asset sale, he was simply taking back 1862 Associates' money pursuant to his company's

perfected security interest.  (R. at 157-59 (July 14, 2005).)

4.   *Torrence Pitcairn and the Pitcairn Trust Company*

Finally, PE used the proceeds of the asset sale to repay loans from Torrance Pitcairn and the

Pitcairn Trust Company, neither of which is a party to this lawsuit.  Torrance Pitcairn, Kean

Pitcairn's younger brother, loaned PE money on two occasions, $366,000.00 on February 28, 2001,

and $400,000.00 on September 5, 2001.  (Defs.' Trial Ex. 3 (Promissory Note of Feb. 28, 2001), Ex.

5 (Promissory Note of Sept. 5, 2001).)  Each loan carried interest, and on May 8, 2002, Torrance

Pitcairn obtained a security interest on each.  (*Id*; Defs.' Trial Ex. 13 (Sec. Agreement for Torrance

Pitcairn).)  The August 5, 2002 bill of sale reflects that, when PE's assets were sold, $900,000.00

was placed in escrow for Torrence Pitcairn, so that his loans could be repaid.  (Defs.' Trial Ex. 9;

*see also* Defs.' Trial Ex. 4 (Canceled Promissory Note of Feb. 28, 2001), Ex. 6 (Canceled

Promissory Note of Sept. 5, 2001).)

The Pitcairn Trust Company made an interest-free loan of $100,000.00 to Kean Pitcairn on May 4, 2001.  (Defs.' Trial Ex. 1 (Promissory Note of May 4, 2001).)  This loan came from "Trust D-54," of which Kean Pitcairn is the current beneficiary.  (*Id.*; R. at 104-05 (July 13, 2005).)  The trust "allows for the right of principal distributions at [the] discretion of the trustee." (R. at 105 (July 13, 2005).)  Clark Pitcairn, the trustee, testified that Kean Pitcairn wanted the $100,000.00 loan "for business purposes."  (*Id.* at 107.)  As the trust "had the right to make distributions of principal," Clark Pitcairn did not inquire into PE's financial condition or attempt to secure the loan.  (*Id.* at 111-12.)  Kean Pitcairn testified that, following the asset sale, he used $100,000.00 of the $711,531.52 wire transfer to PE to repay the Pitcairn Trust Company's May 4, 2001 loan.  (*Id.* at 323; *see also* Defs.' Trial Ex. 2 ("Paid in Full" Promissory Note of May 4, 2001).)

## II.    CONCLUSIONS OF LAW

Plaintiffs contend that, by making the asset transfers described above, Defendants violated: (1) the Pennsylvania Uniform Fraudulent Transfer Act; and (2) Pennsylvania common law.[3]

### A.    The Pennsylvania Uniform Fraudulent Transfer Act

#### 1.    *Overview*

At the heart of Plaintiffs' case are their claims under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 PA. CONS. STAT. §§ 5101-5110 (2005). The PUFTA, which was enacted in 1993, provides creditors with certain remedies, including avoidance, when a debtor makes

---

[3] The parties agree that Pennsylvania law governs this dispute.  *Universal Computer*, 2004 WL 345415, at *3.

a fraudulent transfer.  12 PA. CONS. STAT. § 5107.  The statute defines a "transfer" as "[e]very mode . . . of disposing of or parting with an asset or an interest in an asset.  The term includes payment of money, release, lease, and creation of a lien or other encumbrance."  12 PA. CONS. STAT. § 5101(b).  A transfer may be "fraudulent" as to present or future creditors if the debtor made the transfer:  (1) "with actual intent to hinder, delay or defraud any creditor of the debtor"; *or* (2) "without receiving a reasonably equivalent value in exchange for the transfer or obligation."  12 PA. CONS. STAT. § 5104(a); *see also Tiab Commc'ns Corp. v. Keymarket of NEPA, Inc.*, 263 F. Supp. 2d 925, 934 (M.D. Pa. 2003).  "The first provision [of § 5104(a)] provides for liability under an "actual intent" theory of fraud, while the second is a "constructive fraud" provision."  *In re Blatstein*, 192 F.3d 88, 96 (3d Cir. 1999).  Alternatively, a transfer may be "constructively" fraudulent under § 5105, but as to present creditors only.  12 PA. CONS. STAT. § 5105.

a.   Actual Fraud

For claims of actual fraud under § 5104(a)(1), whether or not the debtor had "actual intent" to hinder, delay or defraud a creditor is a question of fact.  *Self Heating & Cooling, Inc. v. Comm'r*, 87 T.C.M. (CCH) 1163 (2004) (*citing United States v. Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1304 (3d Cir. 1986)); *see also Tiab*, 263 F. Supp. 2d at 934 ("The existence of fraudulent intent may be inferred from all facts and circumstances surrounding the conveyance.").  The PUFTA supplies a nonexclusive list of factors to assist the court in making this determination.  12 PA. CONS. STAT. § 5104(b).  Section 5104(b) states that "consideration may be given, among other factors," to whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued

13

or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* With regard to the first factor, transfer to an insider, the statute's drafters state that:

> The fact that a transfer has been made to a relative or to an affiliated corporation has not been regarded as a badge of fraud sufficient to warrant avoidance *when unaccompanied by any other evidence of fraud.* The courts have uniformly recognized, however, that a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged.

*Id.* cmt. 5 (emphasis added).

If a debtor acts with fraudulent intent, relief may still be denied if the transferee can show that she "took in good faith *and* for a reasonably equivalent value." 12 PA. CONS. STAT. § 5108(a) (emphasis added). A transferee who invokes this defense has the burden of establishing both of these elements. *Id.* cmt. 1; *see also In re Burry*, 309 B.R. 130, 135 (E.D. Pa. 2004). The transferee may establish that she took for "reasonably equivalent value" by demonstrating that she received the transfer in satisfaction of an antecedent debt. *See* 12 PA. CONS. STAT. § 5103. To establish that she took in good faith, the transferee must demonstrate that she "acted without actual fraudulent intent" and "did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor." 12 PA. CONS. STAT. § 5108(a) cmt. 6; *see also Tiab*, 263 F. Supp. 2d at 941.

14

          b.        Constructive Fraud

In lieu of actual fraud under § 5104(a)(1), a court may find constructive fraud under either § 5104(a)(2) (relating to present and future creditors) or § 5105 (relating to present creditors only). Constructive fraud cannot occur unless the debtor makes a transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation." 12 PA. CONS. STAT. § 5104(a)(2); 12 PA. CONS. STAT. § 5105.  In addition, constructive fraud requires evidence that the debtor was financially impaired to some degree.  Specifically, § 5104(a)(2), requires that the debtor:  (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  12 PA. CONS. STAT. § 5104(a)(2).  Similarly, § 5105 requires that the debtor "was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  12 PA. CONS. STAT. § 5105.

A transfer, moreover, may not be constructively fraudulent if it results from "enforcement of a security interest in compliance with 13 Pa. C.S. Div. 9." 12 PA. CONS. STAT. § 5108(e)(2).  In other words, "[s]ubsection (e)(2) protects a transferee who acquires a debtor's interest in an asset as a result of the enforcement of a secured creditor's rights pursuant to and in compliance with the provisions of Article 9 of the Uniform Commercial Code (Division 9 of Title 13)." *Id.* cmt. 5.  Thus, the enforcement of a valid security interest is a complete bar to a claim of constructive fraud.

          2.      *Kris Pitcairn*

First, Plaintiffs contend that the PUFTA was violated either:  (1) on January 26, 2000, when Kris Pitcairn made an unsecured loan to PE; or (2) in August of 2002, when Kris Pitcairn received

$600,000.00 in satisfaction of that loan.  After careful consideration of both the statute and the record, the Court finds "actual fraud" in connection with the August 2002 transfer, in violation of § 5104(a)(1) of the PUFTA.

a.      Preferential Transfers Under the PUFTA

The Court's conclusion that this transfer was "actually fraudulent" turns, as a threshold matter, on the issue of statutory construction.  Defendants argue that the PUFTA only governs "contemporaneous exchanges" and not "preferential transfers."  A contemporaneous exchange is an exchange for present consideration, whereas a preferential transfer involves the satisfaction of a pre-existing (antecedent) debt. *English v. Brown*, 229 F.3d 34, 40 (3d Cir. 1916).  Defendants point out that, because pre-existing creditors have pre-established interests to serve, Pennsylvania courts have generally been more accepting of preferential transfers than of contemporaneous exchanges.  (*See* Defs.' Supplemented Proposed Findings of Fact & Conclusions of Law § II ¶¶ 8-11 (collecting cases).)  This common law delineation, according to Defendants, caused the PUFTA's drafters to "explicitly exclude[] preferential transfers from the purview of the act."  (*See id.* ¶ 12.)

Although the Court agrees that, for many years, Pennsylvania has looked more favorably on preferential transfers, the Court rejects Defendants' argument that preferential transfers have been categorically "excluded" from the reach of the PUFTA.  Defendants are correct that some of the comments to the PUFTA reiterate the common law perspective that, as a general rule, "the preferential transfer does not constitute a fraudulent conveyance."  12 PA CONS. STAT. § 5103 cmt. 1; *see also* 12 PA CONS. STAT. § 5105 cmt. 2.  These comments, however, only appear in the context of the drafters' discussion of constructive fraud.  *See id.*  Moreover, the drafters merely state that the statute does not prohibit "a preferential transfer, *as such*, by an insolvent."  12 PA CONS. STAT. §

16

5103 cmt. 1 (emphasis added).  The most sensible interpretation of these comments, therefore, is that, in fashioning a category of "constructive fraud," the drafters wanted to ensure that this category would not encompass innocent preferential transfers by an insolvent debtor.  By contrast, where "actual fraud" exists, a preferential transfer is still subject to statutory avoidance, if the transferee possesses the requisite culpability.

This interpretation finds support in the common law itself, which has long held that even preferential transfers can be prohibited if the preferred creditor "actively participated in the debtor's fraudulent design."  37 C.J.S. *Fraudulent Conveyances* § 167 (2005); *see also Berger v Kraisman*, 101 A.2d 717, 718 (Pa. 1954) ("[T]he law permits a debtor to prefer one creditor over another but where kinship is involved, the relationship is a circumstance that should weigh in the determination whether the intention was to pay or secure a debt, or merely to use the debt as cover for a fraudulent conveyance.").  This interpretation is also consistent with the "actual fraud" portions of the PUFTA, most notably, with the statute's definition of the "good faith" defense.  *See United States v. Gordon*, 961 F.2d 426, 431 (3d Cir. 1992) (stating that "[i]t is a fundamental rule of statutory construction that all parts of a statute must be read together").  The "good faith" defense appears to incorporate the common law rule on preferences, for it allows a transferee to defeat a claim of actual fraud by arguing that she did not "actively participate in the fraudulent scheme of the debtor."  12 PA CONS. STAT. § 5108(a) cmt. 6.  Tellingly, the drafters state that the PUFTA does not contain an analogous "good faith" defense to constructive fraud, *for the precise reason* that preferential transfers "as such" are not fraudulent.  *See* 12 PA CONS. STAT. § 5103 cmt. 1.

The Court, therefore, finds that although preferential transfers are not "constructively fraudulent," they may be "actually fraudulent" under the PUFTA.

b.      Actual Fraud

Having found that the August 2002 transfer to Kris Pitcairn, which was a preferential transfer, may be analyzed under the statute, the Court now holds that this transfer violated § 5104(a)(1).

There is overwhelming evidence of an "actual intent" to hinder, delay or defraud Plaintiffs, who were creditors of PE.  Kean Pitcairn's transfer of $600,000.00 to Kris Pitcairn, his wife, implicates many of the "badges of fraud" articulated under § 5104(b).  *See* 12 PA CONS. STAT. § 5104(b) (supplying nonexclusive list of factors from which a court may infer a debtor's fraudulent intent).  His wife, of course, is an "insider," a fact which "warrants close scrutiny of the other circumstances" surrounding the transaction.  *Id.* cmt. 5.  The more those circumstances are scrutinized, the more offensive they become.  Kean Pitcairn had been embroiled in legal proceedings with Plaintiffs since June of 2000 and, as of April 16, 2002, knew that Plaintiffs held a judgment against his company worth several hundred thousand dollars.  (*See* Pls.' Trial Ex. 1; *see also* Pls.' Trial Ex. 8.)  Approximately one month after Plaintiffs obtained this judgment, Kean Pitcairn, acting as president of PE, entered into an agreement to sell the business.  (Pls.' Trial Ex. 58.)  He entered into this agreement of sale knowing that PE was "hemorrhaging" and, at this time, was generally unable to pay its debts as they became due.  (*See* R. at 118 (July 14, 2005); Pls.' Trial Ex. 75.)  Nevertheless, Kean Pitcairn concealed from Plaintiffs and from the public that, on August 5, 2002, he was planning to sell substantially all of PE's assets.  (*See* R. at 330-31 (July 13, 2005).)  Perhaps most incredibly, on the date of the asset sale, Kean Pitcairn failed to disclose Plaintiffs' judgment to the Buyer, who would have required that an escrow account be set up for the express purpose of satisfying the judgment.  (*See id.* at 334-39; *see also* Pls.' Trial Exs. 59-61.)

18

Kean Pitcairn, in defense of his actions, protests that Plaintiffs would have been paid at the closing had Plaintiffs been secured, rather than unsecured, creditors.  (R. at 332-33 (July 13, 2005).) He asserts that he paid other unsecured creditors, such as his wife and his personal trust, only because they, unlike Plaintiffs, "asked me for the money back."  (*Id.* at 324.)  Kean Pitcairn's excuses are nonsense.  The Court observes that, beyond concealing the asset sale as a whole, Kean Pitcairn took additional steps to conceal the $600,000.00 transfer to his wife – the bill of sale did not specifically identify the check to Kris Pitcairn, but merely reflected that $711,531.52 had been wire transferred to PE.  (*See* Defs.' Trial Ex. 9.)  Interestingly enough, the wire transfer went to a brand new bank account, in a further attempt to throw Plaintiffs off the scent of Kean Pitcairn's money trail.  (*See* R. at 217-18 (July 13, 2005).)  Although Kean Pitcairn testified that he created the new bank account simply "to [keep] track of the funds from the closing of the dealership," the Court does not find this testimony credible.  (*See id.*)  In sum, considering "all facts and circumstances surrounding the conveyance," the Court holds that Kean Pitcairn acted with fraudulent intent.  *See Tiab,* 263 F. Supp. 2d at 934; *see, e.g.*, *In re Blatstein*, 192 F.3d at 97-98 (holding that debtor acted with actual intent to defraud creditors in making conveyance to his wife).

Moreover, Kris Pitcairn has not satisfied her burden of demonstrating that she took the conveyance "in good faith."  *See* 12 PA CONS. STAT. § 5108(a) & cmt. 6 (if debtor acted with fraudulent intent, burden is on transferee to show that she took in good faith and for reasonably equivalent value).  The conveyance undisputedly compensated Kris Pitcairn for at least some of her January 26, 2000 unsecured loan to PE.  Thus, she took for "reasonably equivalent value," under the PUFTA's definition of that term.  *See* 12 PA. CONS. STAT. § 5103(a) ("[V]alue is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent

19

debt is secured or satisfied."). The lack of real economic substance behind this transaction, however, implies that she did not act in good faith. Originally, she made the loan with money she borrowed from her husband and, although the loan carried annual interest, she never bothered to collect that interest. (*See* R. at 41, 58, 81 (July 13, 2005).) In fact, her testimony suggests that, had she never been repaid for the loan, she would never have known the difference. (*See id.* at 43 ("[E]states get very complicated and I am not concerned about legal and business details. Talk to me about a baby being born.").) More importantly, Kris Pitcairn had knowledge of the dispute between Plaintiffs and PE. (*See id.* at 62.) By August 5, 2002, she was well aware that Plaintiffs had a money judgment against PE. (*See id.* at 59-60.) When questioned why she "did nothing to pay that judgment," she, like her husband, insisted that she did not pay Plaintiffs because they did not register their judgment in Pennsylvania. (*See id.* at 84.) Given this record, Kris Pitcairn has not made the requisite showing of good faith. *See* 12 PA CONS. STAT. § 5108(a) & cmt. 1; *see also Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 211 n.10 (3d Cir. 1990) (stating that, in fraudulent transfer action, "lack of good faith is a factual finding").

Accordingly, the August 2002 transfer to Kris Pitcairn was "actually fraudulent" in violation of § 5104(a)(1).

### 3. *Kean Company*

Plaintiffs also argue that the August 29, 2002 assignment to Kean Company, which gave Kean Company the right to receive rent payments and collect a monthly management fee, violated the PUFTA. It is abundantly clear that, with respect to this transaction, Plaintiffs are correct: the transfer of this benefit to Kean Company was both actually and constructively fraudulent.

a.      Actual Fraud

The assignment of rights from PE to Kean Company violated § 5104(a)(1).  Kean Company, which is wholly owned by Kean and Kris Pitcairn, is an "insider."  (*See* R. at 229 (July 13, 2005).)  Therefore, as with Kean Pitcairn's $600,000.00 transfer to his wife, the Court must closely scrutinize Kean Pitcairn's assignment to Kean Company to determine whether he acted with fraudulent intent.  *See* 12 PA CONS. STAT. § 5104(b) cmt. 5.  As explained above, Kean Pitcairn's conduct leading up to and surrounding the asset sale reflects an "actual intent" to hinder, delay or defraud Plaintiffs.  (*See* discussion *supra* § II(A)(2)(b).)  With respect to Kean Company, specifically, the evidence against Kean Pitcairn is even more damning.  For instance, Kean Pitcairn created Kean Company less than three months before making the assignment, and made the assignment less than a month after the asset sale.  (*See* R. at 229 (July 13, 2005); *see also* Pls.' Trial Ex. 79.)  Given this curiously convenient timing, Kean Pitcairn's assertion that he made the assignment simply because he was "getting into real estate investing as my new career" is not credible.  (*See* R. at 229 (July 13, 2005).)

Moreover, Kean Company has not remotely established that it took this assignment "in good faith and for a reasonably equivalent value."  *See* 12 PA CONS. STAT. § 5108(a) & cmt. 6.  The undisputed record shows that, rather than giving reasonably equivalent value in exchange for this assignment, Kean Company gave PE only $1.00.  (*See* Pls.' Trial Ex. 79.)  Nor is there any evidence that Kean Company did not "actively participate" in Kean Pitcairn's fraudulent scheme; conversely, the record suggests that Kean Company was a shell that Kean Pitcairn created expressly to assist in his scheme to defraud Plaintiffs.  Even Kean Company's counsel, when pressed on this point, wisely did not attempt to argue to the contrary.  (*See* R. at 198 (July 14, 2005) ("I'm not going to make argument on whether or not . . . the assignment from Pitcairn Enterprises to Kean Co. should be

21

undone . . . . I'm not going to sit here and say that it was a fraudulent transfer.  But, I won't make argument on that point.").)

Accordingly, the Court holds that the assignment to Kean Company was "actually fraudulent" in violation of § 5104(a)(1).  This holding is in accord with the rulings of the Bucks County Court of Common Pleas, which has already ordered Kean Company to disgorge its funds to Plaintiffs.  (*See* Pls.' Trial Exs. 11 & 14.)

### b.    Constructive Fraud

The assignment to Kean Company also violated § 5104(a)(2) and § 5105, the PUFTA's constructive fraud provisions.  The assignment falls within the purview of these provisions, as it was a contemporaneous exchange rather than a preferential transfer.  (*See* discussion *supra* § II(A)(2)(a).) The exchange, moreover, was indeed made without "reasonably equivalent value," which is the core requirement of a constructive fraud claim.  *See* 12 PA CONS. STAT. § 5104(a)(2); 12 PA CONS. STAT. § 5105.  Finally, there is no doubt that, at the time the assignment was made, PE's finances were severely impaired  – having disgorged most of its proceeds from the asset sale, PE had virtually no funds.  Thus, Kean Company cannot seriously contest that, at this time, PE was either solvent (*see* 12 PA CONS. STAT. § 5105) or able to pay its debts as they became due (*see* 12 PA CONS. STAT.  § 5104(a)(2)).

Accordingly, the Court holds that in addition to being "actually fraudulent," the assignment to Kean Company was "constructively fraudulent."

### 4.    *1862 Associates*

Plaintiffs further contend that the PUFTA was violated when PE either:  (1) fraudulently accepted a $1,284,000.00 loan from 1862 Associates on February 27, 2002; or (2) fraudulently repaid

that loan on August 5, 2002.  At the conclusion of the bench trial in this case, the Court granted 1862

Associates' motion for judgment as a matter of law, holding that these transfers did not violate the

PUFTA.  (R. at 181 (July 14, 2005)); *see also* FED. R. CIV. P. 52(c) (2005) ("If during a trial without

a jury a party has been fully heard on an issue and the court finds against the party on that issue, the

court may enter judgment as a matter of law against that party . . . or the court may decline to render

any judgment until the close of all the evidence.").  I will now explain my rationale for holding, at

the close of all the evidence, that the transfers were neither actually fraudulent nor constructively

fraudulent under the statute.

a.      Actual Fraud

Regardless of whether Kean Pitcairn, in making transfers to 1862 Associates, had "actual

intent" to hinder, delay or defraud Plaintiffs, 1862 Associates has successfully shown that it "took

in good faith and for a reasonably equivalent value."  *See* 12 PA CONS. STAT. § 5108(a) & cmt. 6.

As noted above, a transfer is not fraudulent under § 5104(a)(1), regardless of the debtor's fraudulent

intent, if the transferee can establish both of these elements.  *See id.*  In this case, 1862 Associates

has demonstrated that it loaned money to PE for reasonably equivalent value, and that, thereafter,

PE simply repaid this debt.  1862 Associates has also proven that, at all relevant times, it acted in

good faith.

On the subject of reasonably equivalent value, the record could not be more clear.  1862

Associates' $1,284,000.00 loan to PE came directly from a $2,000,000.00 loan from StanCorp, a

third party lender.  (Defs.' Trial Ex. 111; R. at 147-48 (July 14, 2005).)  1862 Associates promised

to repay StanCorp the $2,000,000.00 loan at an interest rate of 7.125% per annum.  (*See* Defs.' Trial

Ex. 109.)  PE, in turn, promised to repay 1862 Associates the $1,284,000.00 loan at the same interest

23

rate.  (*See* Defs.' Trial Ex. 113.)  Certainly, PE's February 27, 2002 promissory note constituted

reasonably equivalent value for this loan, particularly because it entitled 1862 Associates to a

security interest in PE's assets.  (*See* R. at 148, 157 (July 14, 2005).)  Less than six months later, at

the asset sale, 1862 Associates recouped the value of its loan, less approximately $50,000.00.  (*Id.*

at 157-58.)  This transfer of money was in exchange for reasonably equivalent value, namely, the

satisfaction of an antecedent debt.  *See* 12 PA. CONS. STAT. § 5103(a)

There is ample evidence, moreover, that 1862 Associates conducted these transactions in

good faith.  For instance, when Kean Pitcairn approached his brother about a potential loan, Clark

Pitcairn attempted to "maintain walls" with his sibling by relying on StanCorp to make an

independent assessment of PE's financial health. (R. at 124-25 (July 13, 2005).)  Indeed, the minutes

from GarthCo's January 30, 2002 board meeting reflect that StanCorp conducted this assessment and

"concluded that there [was] sufficient cash flow from [PE] to support [the] loan." (Defs.' Trial Ex.

105.)  Moreover, at that meeting, and again at the April 11, 2002 meeting, Kean and Torrence

Pitcairn abstained from voting on the loan.  (*Id.*; Defs.' Trial Ex. 116.)  Finally, there is no doubt

that, once the loan was made, 1862 Associates "fully intend[ed]" to be repaid, for it conditioned the

loan on the receipt of a security interest and timely filed a UCC-1.  (*See* R. at 148, 154, 157 (July 14,

2005).)

1862 Associates' good faith is also evidenced by the fact that, prior to the asset sale, Clark

Pitcairn did not know about Plaintiffs' money judgment against PE.  Clark Pitcairn testified that he

did not have such knowledge on April 12, 2002, when the UCC-1 was filed, and believes he

remained unaware on August 5, 2002, when the asset sale took place.  (R. at 145, 167 (July 13,

2005).)  The Court found Clark Pitcairn to be a credible witness and, therefore, accepts this

24

testimony as true.  Similarly, the Court credits Clark Pitcairn's assertion that he "didn't really know about the Plaintiffs" at all and that Plaintiffs were "not a factor" in 1862 Associates' decision-making.  (R. at 157-59 (July 14, 2005).)  On this record, 1862 Associates has carried its burden of showing that it acted "without actual fraudulent intent" and did not "actively participate" in a scheme to defraud Plaintiffs, even assuming that this scheme existed.  *See* 12 PA CONS. STAT. § 5108(a) cmt. 6.

Accordingly, the transfers to 1862 Associates were not "actually fraudulent" in violation of the PUFTA.

b.     Constructive Fraud

Furthermore, the transfers to 1862 Associates were not "constructively fraudulent."  As discussed above, both of these transfers were made in exchange for reasonably equivalent value, which instantly defeats a constructive fraud claim.  *See* 12 PA CONS. STAT. § 5104(a)(2); 12 PA CONS. STAT. § 5105.  Additionally, the August 5, 2002 transfer was made in satisfaction of an antecedent debt, making it a "preferential transfer" which cannot be constructively fraudulent.  *See* 12 PA CONS. STAT. § 5103 cmt. 1.  Finally, the PUFTA is clear that the enforcement of a valid security interest is a bar to a claim of constructive fraud.  *See* 12 PA CONS. STAT. § 5108(e)(2) (stating a transfer may not be constructively fraudulent if it results from "enforcement of a security interest in compliance with 13 Pa. C.S. Div. 9").  The August 5, 2002 transfer was an enforcement of a valid security interest, namely, 1862 Associates' perfected security interest in PE's assets.  (R. at 157-58 (July 14, 2005); *see* also Defs.' Trial Ex. 117.)

Accordingly, the transfers to 1862 Associates did not violate either § 5104(a)(2) or § 5105.

5.      *Torrence Pitcairn and the Pitcairn Trust Company*

Lastly, Plaintiffs contend that the PUFTA was violated when PE made transfers to Torrence Pitcairn and the Pitcairn Trust Company.  This Court, however, cannot address the merits of these arguments because neither Torrence Pitcairn nor the Pitcairn Trust Company is a party to this case.  "Both the debtor/transferor and the transferee are necessary parties to a fraudulent transfer action." Michael L. Cook, *Fraudulent Transfers*, 876 P.L.I./Comm. 511, 543 (2005) (citations omitted); *see also Soffee v. Hall*, 105 A.2d 144, 146 (Pa. 1954) (transferee who was not party to case could not be compelled to reconvey allegedly fraudulent transfer).  This requirement arises from the judicial recognition that the transferee "has an interest in the subject matter of the suit, which should not be affected by a decree unless he has been given a right to be heard."  W.J. Dunn, *Necessary Parties Defendant to Action to Set Aside Conveyance in Fraud of Creditors*, 24 A.L.R. 2d 395 § 16 (2004).

Here, the record reflects that the Pitcairn Trust Company was originally named as a defendant, but was voluntarily dismissed from the case, with prejudice, on July 10, 2003.  (*See* Notice of Voluntarily Dismissal of July 10, 2003.)  Torrence Pitcairn, moreover, was never named as a defendant.  Over seventeen months after commencing this action, Plaintiffs sought leave to amend the Complaint to, inter alia, add Torrence Pitcairn as a party; the Court, however, denied Plaintiffs' motion because they had unduly delayed in seeking amendment, and because amendment would have substantially prejudiced Defendants.  (*See* Mem. & Order of May 18, 2005.)  Absent these necessary parties, the Court cannot address the merits of Plaintiffs' claims against Torrence Pitcairn and the Pitcairn Trust Company.

6.      *Remedies*

Having determined that some of the Defendants have violated the PUFTA, the Court now

turns to the question of Plaintiffs' remedies under that statute.  A creditor who prevails under the PUFTA may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."  12 PA CONS. STAT. § 5107(a)(1).  Furthermore, if the creditor has obtained a judgment on a claim against the debtor, the court may order the creditor to "levy execution on the asset transferred or its proceeds."  12 PA CONS. STAT. § 5107(b).

Plaintiffs assert that the value of their claim, to date, is $659,621.17.  (Pls.' Aff. of Costs ¶ 7.)  This amount represents:  (1) $412,112.53, for the original arbitration award; (2) $183,388.26, for the 10% interest per annum on that award; (3) $161,375.00, for attorneys' fees awarded by the Bucks County Court of Common Pleas; and (4) $116,152.40, for attorneys' fees incurred "since 6/30/04."  (*Id.*)  Although those four items total $873,028.18, Defendants have already partially reimbursed Plaintiffs by paying them $213,407.01 from funds held in escrow.  (*Id.*; *see also* Pls.' Trial Exs. 11 & 14.)  Thus, Plaintiffs are now seeking the $659,621.17 that remains.

The Court holds, however, that Plaintiffs are entitled to only $543,468.77.  Plaintiffs may recover the arbitration award, the 10% interest on that award, and the attorneys' fees awarded in state court (which, presumably, are fees Plaintiffs' expended during the judgment collection process). These items comport with Judge Mellon's order of April 21, 2005, as well as with the April 12, 2002 order issued in the Southern District of Texas.  (*See* Pls.' Trial Exs. 8 & 14.)  Plaintiffs' request for attorneys' fees "since 6/30/04" is a different story.  This item, so far as the Court can discern, is for attorney' fees incurred in the instant action.  Yet, "[i]t is well established that a litigant is responsible for his own counsel fees absent an agreement by the parties or some other established exception . . . . Unfortunately, there is no established exception which permits recovery of attorney fees in an action for fraud." *Koffman v. Smith*, 682 A.2d 1282, 1292 (Pa. Super. Ct. 1996) (affirming trial

court's denial of counsel fees in fraudulent conveyance action).  Plaintiffs' are not entitled to $116,152.40 in attorneys' fees for this action, as it is not part of Plaintiffs' state court collection action, but rather a separate litigation alleging fraud.  Accordingly, the Court will subtract $116,152.40 from Plaintiffs' requested $659,621.17, leaving $543,468.77 to be awarded.

The Court further holds that, to the extent necessary, the $600,000.00 fraudulent transfer to Kris Pitcairn and the fraudulent transfer to Kean Company (worth approximately $7,000 per month) shall be avoided so that Plaintiffs' claim may be satisfied.  Plaintiffs may levy execution on these assets, up to the amount of $543,468.77.[4]

### B.     Pennsylvania Common Law

#### 1.     *Overview*

In additional to alleging statutory fraud under the PUFTA, Plaintiffs also allege equitable fraud under Pennsylvania common law.  Equitable fraud is, in essence, a "creditor's bill" to reach a debtor's equitable assets.  *Universal Computer*, 2004 WL 345415, at *4; *see also United States v. Kensington Shipyard & Drydock Corp.*, 187 F.2d 709, 712 (3d Cir. 1951).  "The purpose of a creditor's bill is to subject the debtor's property, which has been conveyed away in fraud of creditors, to the claims of the creditors by setting aside and voiding the fraudulent conveyance."  *Universal Computer*, 2004 WL 345415, at *4 (*citing  White Co. v. Fin. Corp. of Am.*, 63 F.2d 168, 169 (3d Cir. 1933); *Houseman v. Grossman*, 35 A. 736 (Pa. 1896)).

The "creditor's bill," however, is an ancient common law doctrine which has been largely displaced by the PUFTA.  Specifically, the comments to § 5101 of the PUFTA state that the PUFTA

---

[4] As Plaintiffs have already received most, if not all, of Kean Company's funds to date, the Court expects that the bulk of Plaintiffs' claim will be satisfied from the fraudulent transfer to Kris Pitcairn.

"displaces any general common law of fraudulent transfer derived from the Statute of 13 Elizabeth that otherwise may be applicable to property that constitutes an 'asset' as defined in this chapter." 12 PA CONS. STAT. § 5101 cmt. 1.  In other words, if the property transferred qualifies as an "asset," it is governed by the PUFTA and an action for a "creditor's bill" may not be maintained.  The PUFTA defines an "asset" as "[p]roperty of a debtor," except for:  (1) property to the extent it is encumbered by a valid lien; (2) property to the extent it is generally exempt under nonbankruptcy law; or (3) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.  12 PA CONS. STAT. § 5101(b).

   2. *Discussion*

    Plaintiffs have not argued that, in this case, property was transferred which does not qualify as an "asset."  As such, Plaintiffs' equitable fraud claims appear to be wholly preempted by the PUFTA.  *See* 12 PA CONS. STAT. § 5101 cmt. 1.  Early on in this litigation, Plaintiffs indicated that their PUFTA claims and their equitable fraud claims might in fact be duplicative.  *See Universal Computer*, 2004 WL 345415, at *6 (holding that both causes of action survived a motion to dismiss because, under Federal Rule of Civil Procedure 8, alternative pleading is permissible).  Plaintiffs, it seems, were correct.  The Court thus concludes that Plaintiffs, who have the PUFTA at their disposal, may not also maintain claims for equitable fraud..

    Regardless, Plaintiffs' equitable fraud claims have no merit.  First, with respect to Kris Pitcairn and Kean Company, Plaintiffs have already been granted statutory relief and granting equitable relief would result in a double-recovery.  Second, the Court cannot hold that the transfers to non-parties Torrence Pitcairn and the Pitcairn Trust Company were equitably fraudulent because, as discussed above, "[b]oth the debtor/transferor and the transferee are necessary parties to a

fraudulent transfer action."  Cook, *supra*, at 543; *see also Soffee*, 105 A.2d at 146.  Finally, the transfers to 1862 Associates were not equitably fraudulent because, when Plaintiffs commenced this action, 1862 Associates was a perfected secured creditor with a right to payment superior to that of Plaintiffs.  The filing of a creditor's bill creates an "equitable levy," i.e., "a lien in equity upon the effects of a judgment debtor."  Bispham, George Tucker, *The Principles of Equity: A Treatise on the System of Justice Administered in the Courts of Chancery* (10th Ed. 1922), ch. VI at 807.  Plaintiffs, by pursuing a creditor's bill against 1862 Associates, are claiming to have an equitable lien on the property of the debtor, PE, which is currently in 1862 Associates' possession.  The only way for Plaintiffs to recover that property is to show that their right to payment is superior to that of 1862 Associates – which, as the record reflects, is certainly not the case.  (*See* Defs.' Trial Ex. 117); *see also In re 250 Bell Rd.*, 388 A.2d 297, 301 (Pa. 1978) ("The Pennsylvania approach is to revert to the common law rule that 'first in time is first in right' and distribute the fund to the competing claimants in the chronological order of their claims.").

## III.    CONCLUSION

For the reasons stated above, the Court holds that the August 2002 transfer of $600,000.00 to Kris Pitcairn violated the PUFTA, and judgment on this claim is entered in favor of Plaintiffs and against Defendants PE, Kean Pitcairn, and Kris Pitcairn.  The Court further holds that the August 29, 2002 assignment to Kean Company violated the PUFTA, and judgment on this claim is entered in favor of Plaintiffs and against Defendants PE, Kean Pitcairn, and Kean Company.  As to all of Plaintiffs' remaining claims, judgment is entered in favor of Defendants and against Plaintiffs.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNIVERSAL COMPUTER** | : | |
| **CONSULTING, INC., et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **PITCAIRN ENTERPRISES, INC.,** | : | **No. 03-2398** |
| **et al.,** | : | |
| **Defendants.** | : | |

**ORDER**

**AND NOW**, this **26th** day of **August, 2005**, upon consideration of the parties' Proposed Findings of Fact and Conclusions of Law, Plaintiffs' Affidavit of Costs, Defendants' response thereto, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

1.   Judgment is entered in favor of Plaintiffs and against Defendants Pitcairn Enterprises, Inc. ("PE"), Kean Pitcairn, and Kris Pitcairn on Plaintiffs' claim that, in August of 2002, Kris Pitcairn received $600,000.00 in violation of the Pennsylvania Uniform Fraudulent Transfer Act.

2.   Judgment is entered in favor of Plaintiffs and against Defendants PE, Kean Pitcairn, and Kean Company on Plaintiffs' claim that, on August 29, 2002, Kean Company received an assignment in violation of the Pennsylvania Uniform Fraudulent Transfer Act.

3.   These fraudulent transfers shall be avoided, to the extent necessary, so that Plaintiffs' may recover $543,468.77, the amount which the Court has determined they are owed.

Furthermore, Plaintiffs may levy execution on these assets in an amount not to exceed $543,468.77.

4.      Judgment is entered in favor of Defendants and against Plaintiffs on Plaintiffs' remaining claims.

5.      This Court's Interim Order of July 21, 2005 (Document No. 79) is **VACATED**.[1]

6.      As counsel for Plaintiffs, Mr. James G. Wiles, has failed to fully respond to this Court's Order of August 10, 2005, he shall be sanctioned in the amount of $500.00.[2]

7.      The Clerk of Court is directed to close this case.


**BY THE COURT:**


_____
**Berle M. Schiller, J.**


---

[1]  In vacating this Interim Order, the Court does not intend for Plaintiffs to remit any money that they have already received from the Escrow Account described therein.

[2]  On August 10, 2005, the Court ordered Mr. Wiles to show cause why he should not be sanctioned for filing legal documents while suspended from the practice of law in this District. Mr. Wiles had until August 15, 2005 to respond to the Court's order.  To date, Mr. Wiles has neither submitted a response nor even contacted the Court with regard to this matter.  I conclude that Mr. Wiles has flagrantly disregarded my order and, accordingly, I sanction him in the amount of $500.00.

2